IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| CHARLES EDWARD MCGUIRE, JR., | ) | CASE NO. 3:16CV910 |
| | ) | |
| Petitioner, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| THE STATE OF OHIO, | ) | |
| | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

Petitioner Charles Edward McGuire, Jr., ("Petitioner" or "McGuire") brings this habeas corpus action pursuant to 28 U.S.C. § 2254.  Doc. 1.  McGuire is detained at the Toledo Correctional Institution, having been found guilty by an Allen County, Ohio, Court of Common Pleas jury of aggravated robbery, aggravated burglary and murder.  *State v. McGuire*, Case No. CR2013 0016 (Allen Cty. Common Pleas Ct., filed July 30, 2013).  At sentencing, the trial court merged the aggravated robbery and aggravated burglary counts and sentenced McGuire to ten years for aggravated robbery and fifteen years to life for murder, to be served consecutively, for an aggregate sentence of 25 years to life in prison.  Doc. 9-1, pp. 29-41.[1]

On March 10, 2016, McGuire filed his Petition for Writ of Habeas Corpus setting forth four grounds for relief.  Doc. 1, pp. 5-12.  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  As set forth more fully below, Grounds 1, 2, 3 and 4 are procedurally defaulted, a portion of Ground 5 is not cognizable and the remainder of Ground 5 fails on the merits. Thus, the undersigned

---

[1]  Doc. page citations are to ECF Doc. page numbers.

recommends that McGuire's Petition for Writ of Habeas Corpus (Doc. 1) be **DISMISSED** in part and **DENIED** in part.[2]

# I.  Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008).

## A.  State Court Action

### 1.  Underlying Facts

The following summary of underlying facts is taken from the opinion of the Allen County Court of Appeals, Third Appellate District of Ohio:[3]

> {¶2}This case arises from a home invasion that occurred on December 27, 2012. On that night, James Gipson entered the home of Tim and Juanita Donegan, armed with a crowbar. A struggle ensued, and Gipson was stabbed two times by one of Juanita's sons. Gipson later died as a result of his stab wounds.

> {¶3}....The indictment arose from McGuire's alleged involvement in the home invasion.

*State v. McGuire*, 2015 WL 2354325, at * 1 (Ohio Ct. App. May 18, 2015).[4]  According to the state Court of Appeals, McGuire's involvement was that he directed Gipson to undertake the home invasion and robbery because the Donegans' son owed McGuire a drug debt.  *Id.*, at *1-2.

### 2.  Procedural History

---

[2]  The grounds in the petition that are procedurally defaulted and not cognizable result in a dismissal; the ground in the petition that is addressed on the merits results in a denial.

[3]  McGuire has not demonstrated by clear and convincing evidence that the state court's findings were incorrect. Accordingly, the state court's findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1); *see also Railey*, 540 F. 3d at 397.

[4]  The facts found by the Ohio Court of Appeals with respect to McGuire's involvement are set forth at length below in connection with the discussion of Ground 5 of the Petition.

On February 14, 2013, the Allen County grand jury indicted McGuire on one count of aggravated burglary, R.C. § 2911.11(A)(1), one count of aggravated robbery, R.C. § 2911.01(A)(3), and one count of murder, R.C. § 2902.02(B).  Doc. 9-1, pp. 4-6.  McGuire pleaded not guilty to all counts.  Doc. 9-1, p. 23.

McGuire, though counsel, filed a motion in limine to exclude two types of evidence: (1) prior bad acts consisting of an altercation between McGuire and the Donegans that occurred on December 20, 2012; and (2) admissions made by Gipson to Carrie Lamb on December 27, 2012.[5]  Doc. 9-1, pp. 8-12.  The trial court overruled McGuire's motion.  Doc. 9-1, pp. 16-21.

The jury found McGuire guilty on all counts.  Doc. 9-1, pp. 22-25.  McGuire filed a motion for a new trial, which the trial court denied.  Doc. 9-1, pp. 27, 34.  On September 3, 2013, the court merged the robbery and burglary counts (counts 1 and 2) and the state elected to proceed to sentencing on the aggravated robbery count.  Doc. 9-1, p. 39.  The trial court sentenced McGuire to ten years for aggravated robbery and fifteen years to life for murder, to be served consecutively, for an aggregate sentence of 25 years to life in prison.  Doc. 9-1, pp. 29-41.

**B. Direct Appeal**

On September 23, 2013, McGuire, pro se, filed a notice of appeal with the Ohio Court of Appeals.  Doc. 9-1, p. 44.  In his brief, filed through new counsel, he raised the following assignments of error:

1.  The convictions are not supported by the weight of the evidence.

2.  The evidence was insufficient to sustain the convictions.

3.  The defendant was denied a fair trial because of improper statements made by the prosecutor.

4.  The trial court erred in imposing a mandatory sentence for his conviction of Aggravated Robbery, a violation of 2911.11(A)(1), a first degree felony.

---

[5] McGuire argued that the admissions were hearsay.  Doc. 9-1, pp. 8-12.

Doc. 9-1, p. 51-54, 75.  On May 18, 2015, the Ohio Court of Appeals overruled McGuire's first three assignments of error, but sustained his fourth assignment of error and remanded the case for resentencing on the aggravated robbery count.  *McGuire*, 2015 WL 2354325, at **11-17.  On July 9, 2015, the trial court imposed the original sentence but indicated that the prison term for aggravated robbery was not mandatory.  Doc. 9-1, pp. 153-154.

### C. Ohio Supreme Court

On June 2, 2015, McGuire, *pro se*, filed a notice of appeal with the Ohio Supreme Court. Doc. 9-1, pp. 99-100.  In his memorandum in support of jurisdiction, McGuire raised the following propositions of law:

> 1.  The Constitution requires that the State establish beyond a reasonable doubt every fact necessary to constitute a crime charged or a defendant's due process rights are violated and the presumption of innocence is subverted. (Weight)
>
> 2.  Pursuant to Criminal Rule 29, and after viewing all the evidence in the light most favorable to the prosecution, a not-guilty verdict requires that no rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. (Sufficiency)
>
> 3.  Although violations during trial by the Prosecution, singularly, may not rise to the level of prejudicial error, a conviction must be reversed where the cumulative effect of the errors deprives a defendant his Constitutional right to a fair trial.

Doc. 9-1, p. 103.  On September 30, 2015, the Ohio Supreme Court denied jurisdiction.  Doc. 9-1, p. 304; *State v. McGuire*, 38 N.E.3d. 901 (Table) (Ohio 2015).

### D.  Application to Reopen Appeal pursuant to Rule 26(B)

On July 27, 2015, McGuire, pro se, filed an Application to Reopen pursuant to Ohio App. Rule 26(B) with the Ohio Court of Appeals.  Doc. 9-1, p. 155.  He argued that his appellate counsel was ineffective for failing to raise the following assignments of error on direct appeal:

> 1.  Appellate counsel failed to raise the issue of hearsay of a witness permitted by the Court at trial when it had been preserved for appeal by the objection of the trial counsel during trial.

2.  The trial Court allowed bias and false statements by the Prosecutor during closing arguments meant only to inflame the jury and misguide their duty, and when taken as a whole, constituted prosecutorial misconduct. Although many errors were made, Appellate counsel only raised two. Additional prejudicial statements and errors are included here.

3.  The Court allowed an admittedly Biased Juror to sit on the Jury, severely prejudicing the outcome of the trial. The Court further spoke for the Juror, misquoting their ability to be impartial to the defendant-appellant.

4.  Trial counsel abandoned a Motion in Limine regarding evidence that should have been excluded as evidence relating to other crimes, wrongs, or acts, when it was a valid issue to be resolved by the Court, prior to trial, and additionally, he failed to object to it during trial.

Doc. 9-1, p. 158.  On September 17, 2015, the Ohio Court of Appeals denied McGuire's application, concluding that appellate counsel's representation was neither deficient nor prejudicial.  Doc. 9-1, pp. 233-234.

On October 30, 2015, McGuire, pro se, appealed to the Ohio Supreme Court, asserting the same four assignments of error that he presented in his Rule 26(B) Application as his propositions of law.  Doc. 9-1, pp. 235-239.  On January 20, 2016, the Ohio Supreme Court declined jurisdiction.  Doc. 9-1, p. 305; *State v. McGuire*, 44 N.E.3d. 289 (Table) (Ohio 2016).

### E. Federal Habeas Petition

On March 10, 2016, McGuire, pro se, filed his Petition for a Writ of Habeas Corpus. Doc. 1.  He listed the following grounds for relief:

**Ground One:** (Hearsay) Trial court allowed hearsay testimony at trial

**Supporting Facts:** There was no evidence to support Ms. Lamb['s] testimony everything that Ms. Lamb claimed Mr. Gipson told her was hearsay. Ms. Lamb told three different stories which one is to be believed without the hearsay testimony of Ms. Lamb the State had no actual evidence against Mr. McGuire. The trial court stated that the finding of the $ 200 on Mr. Gipson was independent proof. But money was never found. Ms. Lamb['s] story was contradicted by Mr. Jordan, Mr. McGuire, Ms. Williams and the officers.

**Ground Two:** Improper statements by prosecutor

**Supporting Facts:** The prosecutor['s] closing arguments were in some statements flat out lies and all the rest was never testified to at trial. The prosecutor misle[]d the jury by making statements he knew was false, and further quoted the testimony of witness incorrectly which cause[d] the jury to lose their way and find Mr. McGuire guilty on lies instead of evidence.

<u>Ground Three</u>: Trial counsel abandoned a motion in limine regarding evidence that should never have been excluded other crimes, wrongs, or acts.

**Supporting Facts:** Trial court allowed trial to proceed without ruling on a motion in limine that trial counsel abandoned when it would have kept prejudicial evidence against Mr. McGuire from being stated at trial. Trial counsel or trial court had no right to proceed with trial without ruling on all motions. Trial counsel should have never abandoned the issue without a ruling so Mr. McGuire was giv[en] a[n] unfair trial by the testimony that was allowed.

<u>Ground Four</u>: The court allowed a Biased Juror to sit on the Jury.

**Supporting Facts:** During voir Dire Juror Stokes admitted he knew Detective Clark since Clark was a child. The prosecutor asked Mr. Stokes would he hold it against the defendant Mr. Stokes avoided answering and stated that he was good friends with Detective Clark['s] father. And when he did answer he stated he didn't know. Mr. Stokes also stated that he supposed the run-ins with the people he knew at trial could cause him problems he didn't know for sure. Mr. Stokes was Bias.

<u>Ground Five</u>: Weight and sufficiency of the evidence.

**Supporting Facts:** This case comes down to one statement by a dead man. The only evidence that Mr. McGuire was in any way involved in the home invasion is Carrie Lamb's recollection of a statement by Gi[p]son. Lamb's testimony is simply not credible and is a Hearsay statement. Without this statement there's no evidence.

Doc. 1, pp. 5-12.  On August 19, 2016, Respondent filed a Return of Writ (Doc. 9) and McGuire filed a Traverse on October 31, 2016 (Doc. 11).  In its Return of Writ, Respondent argues that Grounds 1, 2, 3 and 4 are procedurally defaulted, Ground 2, alternatively, fails on the merits, and that a portion of Ground 5 is not cognizable and the remainder fails on the merits. Doc. 9, pp. 14-44.

## II. Law

### A.  Standard of Review under AEDPA

6

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner must meet certain procedural requirements in order to have his claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001).  Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  Failure to exhaust applies when state remedies are "still available at the time of the federal petition." *Id.* at 806 (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).  In contrast, when state court remedies are no longer available, procedural default rather than exhaustion applies. *Williams*, 460 F.3d at 806.

**Exhaustion.**  A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court.  28 U.S.C. § 2254(b)(1)(A).  A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action.  28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459 U.S. 4, 6  (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)) ("[f]ederal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts").  A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  In order to satisfy the fair presentation requirement, a habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  This means that the petitioner must

present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law. *See, e.g.*, *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987).

**Procedural Default.** Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court." *Id*. In *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986), the Sixth Circuit provided four prongs of analysis to be used when determining whether a claim is barred on habeas corpus review due to petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *See also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id*. While the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson,* 501

8

U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review. *Williams,* 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered. *Coleman*, 501 U.S. at 750.

**Merits Review**.  In order to obtain habeas relief under 28 U.S.C. § 2254(d), a petitioner must show either that the state court decision (1) resulted in a decision contrary to, or involving an unreasonable application of, clearly established federal law as determined by the United States Supreme Court ("contrary to" clause); or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings ("unreasonable application" clause). *Id*.

"Under the 'contrary to' clause, a federal habeas court may grant a writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or [based on] a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  "Clearly established federal law" refers to the holdings, not dicta, of the Supreme Court's decisions as of the time of the relevant state court decision, as well as legal principals and standards flowing from Supreme Court precedent. *Id.* at 412; *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  A state court is not required to cite Supreme Court precedent or reflect an awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002);

*Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005).  If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law.  *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

In determining whether the state court's decision involved an unreasonable application of law, the court employs an objective standard.  *Williams*, 529 U.S. at 409.  "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011).  "A state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  *Harrington*, 562 U.S. at 103.

### III. Claim Analysis

McGuire sets forth five grounds for relief in his Petition.  Doc. 1, pp. 5-12.  For convenience, the undersigned considers McGuire's claims out of sequential order.  The undersigned recommends the Court find that a portion of Grounds 5 is not cognizable and the remainder of Ground 5 fails on the merits, and that Grounds 1, 2, 3, and 4 are procedurally defaulted.

### A. A portion of Ground 5 is not cognizable and the remainder fails on the merits

In Ground 5, McGuire argues that his conviction is against the weight and the sufficiency of the evidence.  Doc. 1, p. 12.

### 1.  Weight of the evidence

Federal habeas corpus relief is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 US 1, 5 (2010).  A claim that a conviction is against the manifest weight of the evidence rests solely on state law and is not a cognizable claim in a federal habeas case.  *See Ross v. Pineda*, 2011 WL 1337102, at *3 (S.D.Ohio April 11, 2011) ("Whether a conviction is against the manifest weight of the evidence is purely a question of Ohio law," citing *State v. Thompkins*, 678 N.E.2d 541 (Ohio 1997)).  Because McGuire's manifest weight of the evidence claim in Ground 5 rests solely on state law, it is not cognizable on federal habeas review.  *See id.*

### 2.  Sufficiency of the evidence

The remainder of Ground 5, McGuire's sufficiency of the evidence claim, is cognizable, however.  In reviewing a claim that a petitioner's conviction was not supported by sufficient evidence, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Under this standard, deference is due the jury's determination.  *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  The standard is not whether the trier of fact made the correct guilt or innocence determination but, rather, whether it made a rational decision to convict or acquit.  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  Thus, in making a determination as to sufficiency of evidence, a court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury."  *Brown*, 567 F.3d at 205; *see also Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003).  "Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt."  *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (internal

quotations and citations omitted); *see also Durr v. Mitchell*, 487 F.3d 423, 449 (6th Cir. 2007) ("circumstantial evidence is entitled to equal weight as direct evidence").

On federal habeas review, an additional layer of deference applies. *Brown*, 567 F.3d at 205; *Snyder v. Marion Corr. Inst., Warden*, 608 Fed. App'x 325, 327 (6th Cir. 2015) (indicating that, where a petitioner's "claims arise in the context of a § 2254 petition, [the court's analysis] must be refracted through yet another filter of deference") (citing *Coleman v. Johnson*, — U.S. —, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012) (per curiam) which reaffirmed that sufficiency of the evidence claims under *Jackson* "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference"). Accordingly, even if this Court were to conclude that a rational trier of fact could not have found petitioner guilty beyond a reasonable doubt, the Court "must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205 (emphasis in original); *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009).

The Ohio Court of Appeals set forth the evidence presented at trial:

{¶ 8} .... The State's first witness was Michael Hartman, who testified that he lives with his mother, Juanita Donegan; step-father, Tim Donegan; and his little brother, C.J.[] Hartman at 1136 Catalpa Avenue. Michael stated that he knows McGuire because McGuire is an acquaintance of his step-father. Michael admitted to buying marijuana from McGuire a couple of weeks before the home invasion. Michael told McGuire that he did not have any money on him, but would be able to give McGuire a gift card he would receive on Christmas. Michael testified that they both agreed that McGuire would sell him marijuana in exchange for the gift card. According to Michael, he received $45 worth of marijuana.

{¶ 9} On December 20, 2012, Michael was at work, but later found out that McGuire, McGuire's cousin, Tarockis, and a woman were at his house harassing his family about his drug debt. As a result of this incident, Michael stated that his family filed a restraining order against McGuire, which was filed on December 26, 201[2]. He testified that his family was "very scared" and "were intimidated" by McGuire and his friends. *Id.* at p. 214. Michael also stated that McGuire would call the house and ask for rides. His parents "obliged because they were afraid that if they didn't do what he asked or told [them] that more harm would have came [sic] to the family." *Id.*

{¶ 10} Michael then testified as to the events that occurred on the night of December 27, 2012. He stated that around 8:00 p.m., he was watching a movie with Juanita and C.J., and Tim was sleeping in another room. While watching the movie, somebody knocked on their front door. Michael answered the door, and the man asked for Juanita and asked if he could use their phone. Michael testified that he did not recognize the man, but let him into the house anyways. Although Michael did not know who the man was at that time, he was later able to identify him as Gipson. When Gipson came into the house, he asked Michael to shut the curtains. When Michael refused, Gipson became "hostile." *Id*. at 219. Gipson then took out a crow bar from his coat and demanded "our X–Box, our TV, our Christmas presents, everything in the house with a value [was] pretty much his words." *Id*. at 223.

{¶ 11} At this point, Juanita came out of the bathroom and picked up a beer bottle. Gipson swung the crowbar at Juanita, and Michael tackled Gipson to the ground. While Michael and Gipson were fighting, Gipson hit him in the head with the crowbar. As Michael was recovering from the blow, C.J. "jump[ed] up and stab[bed] [Gipson] twice within the abdomen region." *Id*. at p. 226. Michael testified:

> I'm wrestling Mr. Gibson [sic]. My step-dad comes out and he gets involved and we both start wrestling him. And he manages to get outside. And I stand up to pull him back into the house and he takes off his coat and the hoodie that was underneath it so all he had on was a red or white shirt that was red with blood. And he starts running towards Holmes, which is where he lived, I found out later. And he was running away he was yelling, "I'm sorry. I'm sorry."

*Id*. at p. 228.

{¶ 12} On cross-examination, Michael talked about the marijuana he bought from McGuire. Michael stated that McGuire told him it was "kush," which is a type of marijuana that is more expensive than regular marijuana. Michael stated that an ounce of kush would cost $175 dollars, however, Michael told McGuire that he did not believe that the marijuana was kush. Specifically, Michael testified that

> [w]e had talked about it and I told him that it was not kush and that I wasn't paying like the price that he wanted me to, but I would give him the seventy-five ($75.00) dollar gift card for it, which in my mind was too much. But since I had made him wait for it, seventy-five ($75.00) dollars in my mind was good enough.

*Id*. at 233. Michael also stated that he was unaware that his step-father allegedly owed McGuire money.

{¶ 13} Michael testified that he had never seen Gipson before that night. He also admitted that Gipson never mentioned McGuire's name that night. Michael stated that his family never had any problems with McGuire before. He also stated that after the incident on December 20, 2012, his parents were still giving McGuire rides and storing their meat in McGuire's refrigerator.

{¶ 14} The State's next witness was Juanita Donegan. She testified that on December 20, 2012, Tarockis and Heather Lambert came to her house demanding payment for Michael's "drug debt." *Id.* at p. 243. She testified:

> A: They came in and [Tarockis] was immediately confrontational with me, demanding money.
>
> Q: Okay.
>
> A: Demanding money for Michael's, quote, unquote, drug debt.
>
> Q: Okay. And was he just demanding money?
>
> A: It started off as that. And then when I repeatedly told him I do not have any money he says, "well", as he's in my face, like in my face, he's saying, "well, then we'll take that and that, pointing to my TV and my son's X–Box, and all of that (indicating). It was the 20th so all our Christmas presents were on display.
>
> Q: All right. So, what else happened?
>
> A: Just repeatedly, repeatedly, in my face about he wanted the money. He wanted the money. He wanted the money. "When C.J.,"—that's what he referred to as McGuire—
>
> Q: Uh-huh.
>
> A:—"going to get his money?" and I'm like, "look, I don't have any money." And it wasn't very long—it seemed like a long time, but it wasn't very long—and McGuire came to the door and came in. And at first he was real rational, kind of—kind of pulling the sweetie pie, that, "hey, you know, I—I understand" and all that. Look, I don't under—first, of all I didn't understand how it went from a forty ($40.00) dollar drug debt to a seven hundred and fifty ($750.00) dollar drug debt. And he's like, "well, there's interest ." I'm like, "that's a lot of interest."

*Id.* at p. 243–244.

{¶ 15} Juanita then gave McGuire two $75 visa gift cards, but McGuire still demanded the remaining $600. Juanita told McGuire that she would pay him the $600 when her husband got paid on January 1. McGuire then told Juanita that if she did not pay him the $600, he would be back to beat up her husband and Michael. After this incident, Juanita stated that she went to the prosecutor's office and filed a temporary protection order ("TPO") against McGuire.

{¶ 16} On December 27, around 8:00 or 8:30 p.m., Juanita was getting ready to watch a movie with her two sons when she heard a knock on the door. As she came out of the bathroom, she saw a man who she did not recognize. She then testified that

[the man was] like, "well, first off," looking at Michael, "you need to"—"you need to close the window." It's like immediate, "no, he doesn't. You need to get the fuck out." And he kind of shook his arm and I saw the hook of a crowbar. And I'm like, "you need to get the fuck out." He's like, "No. You're going to give me that and that," pointing to my television and X–Box. I'm like, "no," again, "no, you're going to get the fuck out." And at that point I—it happened like boom, boom, boom. Crowbar came out of his sleeve. Michael jumped up. I'm not exactly real clear on what happened. I know Michael jumped up. For some reason, I don't know why, I grabbed the first weapon, something I could use as a weapon, which happened to be a beer bottle. I saw a crowbar. I jerked back. It hit me. It didn't like knock me out. It didn't hit me hard.

*Id*. at p. 254–255.

{¶ 17} Although she was not knocked out, Juanita did not see what happened next. She then had the following relevant exchange:

Q: Now, after this happened, did you hear anything else from the defendant, Charles McGuire?

A: I kind of—I thought it was him came up as we were—as Michael and I were going in the ambulance, "hey, what's going on?" That's all I know.

Q: Did you speak with him?

A: No. I was—I was going in the ambulance. I was more concerned about my bleeding son than anything.

Q: And after the 27th did you hear from the defendant?

A: No.

*Id*. at p. 262.

{¶ 18} On cross-examination, Juanita admitted that her husband and McGuire spent a lot of time together. Specifically, Juanita stated that her husband would go over to McGuire's to use his computer and refrigerator. McGuire later told Juanita that Tim was using his computer to meet women online. She also stated that Tim would give McGuire rides to work. Juanita heard that Tim broke McGuire's chair and admitted that he might have owed McGuire money for the chair. She also admitted to giving McGuire and his friends rides, even after she got a TPO against McGuire.

{¶ 19} On redirect examination, Juanita explained that she continued to give McGuire rides, even after she got the TPO, because she did not want to do anything out of the ordinary or anger McGuire any further.

15

{¶ 20} C.J. Hartman was the next witness for the State. He testified that he knew McGuire through Tim. On December, 20, 2012, C .J. was at home when McGuire and Tarockis came into the house and said that Michael owed them money. Tarockis told his family that they owed him $750 and that if they did not pay him, he would take their television, Xbox, and Christmas presents. After Tarockis threatened his family, McGuire came into the house. According to C.J., at first McGuire was nice, but eventually McGuire started to threaten Tim and Michael. McGuire left after Juanita gave him some gift cards and promised to have the rest of his money by January 1.

{¶ 21} C.J. testified that around 7:00 or 8:00 p.m., on December 27, 2012, a man knocked on the door to his house. C.J. stated that he had never seen the man before, but later identified the man as Gipson. After Gipson came inside, he demanded their television and Xbox. When C.J.'s family refused, Gipson took out a crowbar from his jacket and started swinging. C.J. testified that his mother picked up a beer bottle, and Michael tackled Gipson to the ground. Gipson hit Michael on the head with the crowbar and Michael started to bleed. C.J. then stated he picked up his knife and stabbed Gipson. Gipson then turned around, and C.J. believed that he was going to hit him, so he stabbed Gipson again.

{¶ 22} On cross-examination, C.J. denied that McGuire sold Michael kush. C.J. stated that he smoked the marijuana with Michael and it "was not very good marijuana." *Id*. at p. 307. C.J. also denied that Gipson initially demanded money when he went into the house. C.J. testified that Gipson only wanted their television and Xbox. He later found out that Gipson lived nearby and stated that he did not hear Gipson pull up in a car. Further, C.J. testified that Gipson did not mention McGuire at all during the incident.

{¶ 23} Patrolman Dustin Brotherwood of the Lima Police Department was the next witness to testify. He testified that he was working on the night of December 27, 2012, and was dispatched to a home invasion. After arriving on the scene, Patrolman Brotherwood started to look for the suspect who had fled the scene. He stated that he found the suspect, who he later identified as Gipson, in front of 1119 Holmes Street.

{¶ 24} On cross-examination, Patrolman Brotherwood had the following relevant exchange:

> Q: Okay. Now, did you ever have an opportunity to speak to Ms.—Ms. Lamb?
>
> A: Very—
>
> Q: I mean, yes, Carrie Lamb?
>
> A: Very briefly.
>
> Q: As a matter of fact, she made a couple of unsolicited statements for you, right?
>
> A: Yes, sir.

16

Q: She indicated that—that [Gipson] had been feuding on Catalpa with people?

A: Yes, sir.

*Id.* at p. 326. Patrolman Brotherwood also stated that when he arrived, Gipson was still alive, but he did not try to question him.

{¶ 25} The State then called Samantha Henline, who testified that she dated McGuire towards the end of 2012. She testified that she was aware that McGuire sold marijuana to Michael and C.J. She stated that they agreed that the marijuana would be paid for in gift cards. She also stated that Gipson would buy marijuana from McGuire, in her presence. Henline testified Gipson did not buy the marijuana on credit and that she was unaware of any argument between Gipson and McGuire.

{¶ 26} Henline stated that she was in the car with McGuire, Heather Lambert, Tarockis, and Tim Donegan, on December 20, 2012. During that car ride, McGuire and Tim had a conversation about a drug debt that one of Tim's sons owed. Henline stated that McGuire said the drug debt was $300 and that if it was not paid by midnight, then it was going to be more. Henline stated that she heard McGuire say he would take their television if the debt was not paid.

{¶ 27} On cross-examination, Henline stated that she remembered when Tim was over at McGuire's house and broke a chair. She stated that McGuire mentioned the chair when they were in the car discussing Michael's drug debt. She also testified that Tim and McGuire were laughing and it seemed like they were "just playing around * * *." *Id.* at p. 381. She then had the following relevant exchange:

Q: Okay. Now, you—in that time that you were hanging around with Mr. McGuire, you said you met [Gipson] one time?

A: Yes.

Q: Okay. Did you get the impression that [Gipson] worked for [McGuire] or did—

A: No.

Q: Was a gopher for him?

A: No.

Q: No. Not at all?

A: No.

*Id.* at p. 382.

17

{¶ 28} On redirect examination, she admitted that she told Detective Clark that she overheard a conversation between Gipson and McGuire about Gipson owing McGuire money and having till the end of the month to pay it back.

{¶ 29} Heather Lambert then testified as to what happened during the car ride on December 20, 2012. She stated that McGuire told Tim that his stepson owed him money and that the debt would go up the longer he had to wait. Specifically, McGuire said that "he owed him three hundred. Then it would go to six hundred, eight hundred, and so forth the longer he had to wait." *Id.* at p. 394. McGuire also said that he would take anything valuable in Tim's house to pay the debt, including the television, Xbox, and Christmas presents. Lambert testified that after they got out of the car, McGuire told Tarockis to go to Tim's house to tell Juanita that the debt needed to be paid.

{¶ 30} Lambert walked with Tarockis to Tim's house because she had left her drink in Tim's car. McGuire eventually joined her and Tarockis at the Donegans'. Lambert testified that after McGuire came over, he started arguing with Juanita.

> So, they start arguing. She made it clear she didn't have the money. That she wouldn't have the money. She doesn't have that type of money around. That the only money they had on them were 2 Wal–Mart gift cards at the time that she did give to him. And then it progressed from there to arguing, to him smacking Tim again, pushing him, punching him, still telling the lady that they needed the money.

*Id.* at p. 388. Lambert admitted that she pushed Tim but testified that McGuire told her to do it. Lambert stated that Tim had kissed her and was cheating on Juanita.

{¶ 31} On cross-examination, Lambert testified that she heard Juanita tell McGuire that she would pay him his money on January 3.

{¶ 32} Carrie Lamb was the next witness for the State and testified that Gipson was her boyfriend and father of her twin girls. Lamb testified that Gipson knew McGuire because Gipson would buy his marijuana from McGuire. On December 27, 2012, Lamb testified that Gipson was going back and forth from their house to McGuire's house. She stated that McGuire invited Gipson to come over and smoke blunts with him. Lamb testified that she started to text Gipson, and he replied that he was "going to go do something." *Id.* at p. 422. She stated that Gipson came back to their house to change clothes and then had the following conversation: [FN3]

> [FN3] At this point in the trial, McGuire's counsel objected to the statement Lamb was about to make, on the basis it was impermissible hearsay. The trial court overruled the objection.
>
> A: He wanted McGuire to—
>
> Q: Okay. Before that, did he ask for anything? Ask you for any—

18

A: The crowbar.

Q: He asked for the crowbar. And what else?

A: I told him where it was. And then he went and got it and he went out the door. But, before he went out the door he told me that McGuire wanted him to go into these people's house and take their TV and their game system.

Q: Okay. And what was in it for [Gipson]?

A: His debt paid off, which was like ten, fifteen dollars, and two hundred ($200.00) dollars.

Q: Okay. So, it was your understanding that the reason [Gipson] went over there is because the defendant sent him there to get the TV and the X–Box and for that he was going to get his debt—his drug debt wiped out and two hundred bucks?

A: Yes.

*Id*. at p. 423.

{¶ 33} On cross-examination, Lamb admitted that she told police officers, two separate times, that Gipson was feuding with people on Catalpa Avenue. She also admitted to threatening the Donegans over the phone after the home invasion. Lamb then testified:

Q: So when [Gipson] came over to get the crowbar, when he came to get the crowbar, that's when he came home at 6:00?

A: No. When he came and got the crowbar that was about 8:00 something.

Q: Okay. So he, had gotten home about 6:00. He left. And then he came back again?

A: Yeah. He went over to McGuire's house to smoke with him. Came back. Said something about the changing table and stuff. And then he was going to go back over to McGuire's house and—and relax with him, I guess. And—

Q: So, that was at 8:17 when he left?

A: Yes.

*Id*. at p. 440–441.

{¶ 34} Lamb also acknowledged making the statement that Gipson had $200 on his person. She stated that her neighbor, Angela Jordan, was tending to Gipson after he got stabbed and Jordan "told me that [Gipson] had—was pointing to his pockets [and] that she pulled out two hundred ($200.00) dollars * * *." *Id*. at p. 446. However, Lamb asked

the detectives about the money and they told her that they did not recover any money from Gipson's person.

{¶ 35} Detective Kent Miller of the Lima Police Department was the next witness to testify for the State. Detective Miller was one of the lead detectives on McGuire's case and assisted in conducting some of the interviews as well as analyzing phone records and data. From his investigation, Detective Miller was able to piece together a timeline of the events of December 27, 2012. He stated that on that day, Gipson called McGuire at 6:15 p.m.; at 6:43 McGuire called Gipson; and at 6:44 Gipson called McGuire. Gipson placed another call to McGuire around 7:06. From his interview with Lamb, Detective Miller determined that Gipson was over at McGuire's from 7:06 to shortly after 8:00 p.m. Carrie sent Gipson two text messages, and then at 8:03 p.m., Gipson sent Carrie a text message that read, "I [sic] going to do something." (State's Exhibit 35, p. 1). Carrie then sent Gipson 21 text messages that went unanswered. Her last text message to Gipson was at 8:12 p.m. Based upon his conversation with Lamb, Detective Miller assumed that Gipson arrived home, changed his clothes and grabbed the crowbar "slightly after 8:12 p.m." Trial Tr., p. 473. After Gipson left his house, he placed a call to McGuire at 8:23 p.m., which lasted 59 seconds. Then, at 8:29 p.m., a 9–1–1 call was placed by the Donegans.

{¶ 36} By 8:31 p.m., Gipson had a missed call from Lamb. Gipson also had a missed call from McGuire at 8:49 p.m. The Donegans then received missed calls from McGuire at 9:38 p.m. and at 12:03 a.m. Detective Miller testified that he believed these phone calls were very important to the investigation.

{¶ 37} The State then called Doctor Maneesha Pandey, a deputy coroner and forensic pathologist at the Lucas County Coroner's Office. It was stipulated that Dr. Pandey was an expert in forensic pathology. Dr. Pandey testified that Gipson's cause of death was "sharp force trauma to torso. And the manner of death was homicide." *Id*. at p. 508. She also testified that Gipson's urine tested positive for marijuana, which was consistent with recent exposure to marijuana. She also testified that she did not detect any alcohol in Gipson's blood.

{¶ 38} After Dr. Pandey's testimony, the trial court received all of the State's exhibits into evidence, and the State rested. McGuire moved for acquittal under Crim.R. 29, but the trial court denied the motion.

{¶ 39} McGuire's first witness was Patrolman Jason Warren of the Lima Police Department. Patrolman Warren responded to the home invasion on December 27, 2012. Patrolman Warren drove down Holmes Avenue in pursuit of the suspect. Patrolman Warren testified that he heard screaming on Holmes Avenue, so he stopped his car and saw two women surrounding a man who was lying in the snow. Patrolman Warren asked Carrie Lamb what had happened, and she "told [him] that there had been an argument with the neighbors across the way. She didn't specific—specify where. And that he had been defending her." *Id*. at p. 524.

{¶ 40} Angela Jordan, Gipson and Lamb's neighbor, then testified. She testified that on the night of December 27, 2012, she was taking out her trash and heard screaming. She

testified that Lamb was standing over Gipson and was kicking him. Jordan tried to stop the bleeding and told Lamb to get blankets. Jordan denied ever telling Lamb that McGuire had $200 in his pockets. She also testified that she did not see Lamb's son outside or in Lamb's house.

{¶ 41} Amy Williams, one of McGuire's ex-girlfriends, was the next witness to testify. She testified that she was at McGuire's house on the night of December 27, 2012. Williams also testified that Gipson came over to McGuire's for about 20 minutes that night. She stated that they were not smoking marijuana, but they were drinking Black Velvet. She stated that McGuire was offering to sell Gipson a crib. Gipson said that he would come back with his girlfriend to look at the crib. According to Williams, she did not hear McGuire and Gipson discuss collecting a debt. Williams testified she left McGuire's around 9:00 or 10:00 p.m. because he was drinking and that McGuire could get "ugly" when he was drinking. *Id*. at p. 545.

{¶ 42} On cross-examination, Williams admitted that Gipson could have been at McGuire's earlier in the day. She also stated that McGuire and Gipson could have had other conversations while she was out of the room.

{¶ 43} McGuire then testified on his own behalf. McGuire first admitted to having a criminal record. Specifically, McGuire stated that he has been convicted of receiving stolen property, robbery, and assault on a police officer. McGuire also admitted that he initially lied to Detective Clark when asked if he sold drugs. McGuire testified that he would occasionally sell drugs, but denied it to Detective Clark because he was still on post release control and did not want to get a violation.

{¶ 44} McGuire admitted to selling marijuana to Michael. However, he testified that it was "kush" and that it was worth $175. *Id*. at p. 566. He also stated that Tim broke his rocking chair that was worth $300.

{¶ 45} McGuire testified that on December 20, 2012, he was in the car with Tim, Tarockis, Heather Lambert, and Samantha Henline. He admitted that he told Tim that Michael owed him money for the marijuana he sold him, but denied threatening Tim. McGuire testified that after he got back to his house, Heather told him that Tim had tried to kiss her. Heather decided to tell Juanita what had happened and went to the Donegans' house with Tarockis. McGuire testified that he went over to make sure everything was okay. McGuire stated that while he was there, he reminded Tim and Juanita that they owed him $750. McGuire explained why he believed he was owed $750:

> Okay, it goes like this here. The chair was three hundred ($300 .00) dollars. Then you got a hundred and fifty ($150.00) dollars of miscellaneous loans. You got ($50.00) dollars for putting the food in [my] refrigerator because they [sic] freezer went out. You got fifty ($50.00) dollars for him always using my laptop. Then you—then you got two hundred ($200.00) dollars for the weed. And then it was fifty ($50.00) dollars for something else, you know.

21

*Id.* at p. 575. According to McGuire, Juanita agreed to pay the debt on January 1. However, a few days later, she informed him that she would pay it on January 3.

{¶ 46} McGuire denied knowing that Juanita and Tim had gotten a TPO against him. He stated that Juanita and Tim called his phone, came to his house, and gave him rides after filing the TPO. He testified that he did not find out about the TPO until he was served papers in jail on February 14, 2013.

{¶ 47} McGuire knew Gipson from the neighborhood and denied that Gipson ever worked for him or pushed drugs for him. On December 27, 2012, Gipson paid McGuire $10 or $15 for marijuana and cigarettes. McGuire testified he saw Gipson a couple of times that day. Gipson came over to his house early in the day and the last time he was at his house was around 8:00 p.m. McGuire testified that Gipson took a shot of Black Velvet with McGuire. McGuire denied telling Gipson about the debt that the Donegans owed him, but acknowledged Gipson could have known about it. McGuire stated that his neighborhood "it's like the pro—projects. The—this neighbor know what this neighbor's doing. Everybody know what everybody is doing. So everybody know everybody's business. It's one of them type of neighborhoods." *Id.* at p. 589.

{¶ 48} When Gipson came over to McGuire's house around 8:00 p.m., McGuire testified that they were talking about a crib and changing table. McGuire did not need them anymore and knew that Gipson was expecting twins so he offered to sell the table and crib to Gipson for $80. McGuire testified that Gipson said that he had to talk to Lamb about it and bring her back to look at the table and crib. McGuire stated that around 8:23 p.m., Gipson called him and said that he would be back in a little while to give him the money for the table and crib. McGuire claimed he had no idea that Gipson was going to the Donegans' house.

{¶ 49} McGuire testified that he offered to take a lie detector test when he was questioned by police officers and also offered to give them his fingerprints. He stated that it did not make sense to pay Gipson to rob the Donegans because their television and Xbox would not be worth very much money at a pawn shop. He said that he was waiting for Juanita to pay him the remaining $600 debt on January 3.

{¶ 50} On cross-examination, McGuire denied telling Detective Clark that $300 of the debt was interest he was charging the Donegans.

{¶ 51} After McGuire's testimony, the defense rested. The State then called Detective Clark as a rebuttal witness. Detective Clark testified that when he interviewed McGuire, he stated that

> A: Tim Donegan owed him a hundred ($100.00) dollars for various, you know, lending's [sic]. And that he had broken a chair at his house and he had decided the he owed him two hundred and fifty ($250 .00) dollars for that for a total of three hundred and fifty in actual items or debt.
>
> Q: Okay. But he told you that he—he told him that the debt was six-fifty, right?

22

> A: He—he eventually told me that the Donegan's [sic] owed him seven hundred and fifty ($750.00) dollars. And he admitted to me that the Donegan's [sic] had paid on that debt by giving him 2 credit cards, which were a hundred and fifty ($150.00) dollar total value, which then lowered the debt to six hundred ($600.00) dollars.
>
> * * *
>
> Q: Okay. And as a matter of fact, you talked to him about that and—and he didn't have a good answer why the interest was so high, right?
>
> A: No. He told me that he assessed interest for the debt.

Id. at p. 647–648.

McGuire, 2015 WL 2354325, at **2-10.  The state Court of Appeals noted that there was no dispute that Gipson robbed or burglarized the Donegans and that the only issue on appeal was whether McGuire was complicit in committing the crimes.  Id., at *11.  The state Court of Appeals considered McGuire's sufficiency claim:

> {¶ 60} Complicity is defined as, "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: (1) solicit or procure another to commit the offense; [or] (2) aid or abet another in committing the offense[.]" R.C. 2923.03(A)(1), (2). Therefore, in order for there to be sufficient evidence, the State had to produce evidence, that when viewed in the light most favorable to the state, any rational trier of fact could find that McGuire acted knowingly in soliciting or procuring Gipson to rob and burglarize the Donegans. On appeal, McGuire argues that the State failed to prove that he either solicited Gipson to commit the robbery/burglary or aided and abetted Gipson in the robbery/burglary.
>
> {¶ 61} However, the State presented several witnesses who testified that McGuire and his acquaintances visited the Donegans a few days before the home invasion, demanded the money for Michael's drug debt, threatened to beat them up, and said they would take their television and Xbox if the debt was not paid. Further, the State presented the testimony of Carrie Lamb, who testified at trial that Gipson had told her that McGuire had told him to go to someone's house and take their television and game system.[4] See Trial Tr., p. 423. In exchange, McGuire would forgive Gipson's $15 debt and pay him an additional $200. The State also offered evidence of Gipson's and McGuire's phone activity on the date of the home invasion. Specifically, Gipson texted Lamb at 8:03 p.m., shortly before Lamb testified he came home to change his clothes and get the crowbar, and he told her that he was "going to do something." Right before the home invasion, Gipson called McGuire, and they had a one minute phone conversation. Six minutes later, a 9–1–1 call was placed by the Donegans.

[FN4] McGuire does not argue on appeal that these statements were improperly admitted into evidence despite filing a motion in limine to exclude such statements and properly renewing his objection at trial.

{¶ 62} The above evidence, when viewed in the light most favorable to the prosecution, was sufficient to support McGuire's aggravated robbery and burglary convictions.

*McGuire's Murder Conviction*

{¶ 63} McGuire was also convicted of complicity to commit murder, a violation of R.C. 2903.02(B), commonly known as felony murder. This section states, "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." R.C. 2903.02(B). Under Ohio's felony murder statute, "it is irrelevant whether the killer is the defendant, an accomplice, or a third party." *State v. Ford*, 10th Dist. Franklin No. 07AP–803, 2008–Ohio–4373, ¶ 32. Also, the guilt or innocence of the party killed does not matter. *State v. Dixon*, 2d Dist. Montgomery No. 18582, 2002 WL 191582, *5 (Feb. 8, 2002). A defendant

> can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the "proximate result" of [the] Defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience.

*Id*.

{¶ 64} "It is not necessary that the accused [be] in a position to foresee the precise consequence of his conduct; only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct." *State v. Lovelace*, 137 Ohio App.3d 206, 219–220, 738 N.E.2d 418 (1st Dist.1999), quoting *State v. Losey*, 23 Ohio App.3d 93, 96, 491 N.E.2d 379 (10th Dist.1985). "Only a reasonably unforeseeable intervening cause will absolve one of criminal liability in this context." *State v. Dykas*, 185 Ohio App.3d 763, 925 N.E.2d 685, 2010–Ohio–359, ¶ 25 (8th Dist.), citing *Lovelace* at 215, 738 N.E.2d 418.

{¶ 65} As we recapped supra, the State presented evidence that McGuire was complicit in Gipson's attempted robbery and burglary of the Donegans. Further, the State produced evidence that showed Gipson was armed with a crowbar during the home invasion. Attempting to rob and burglarize someone in their home with a weapon might reasonably lead the victims to defend themselves with their own weapons. Thus, the death of Gipson was foreseeable. *See Dixon* at *6 ("Clearly, the shooting which killed [an accomplice] was within the scope of the risk created by [the defendant] when [they] robbed the Jiffy Lube at gunpoint.").

24

{¶ 66} When viewing the evidence in the light most favorable to the prosecution, we find that the State presented sufficient evidence to support McGuire's felony murder conviction.

*Id*., at *12-13.

The Ohio Court of Appeals applied the correct standard to McGuire's sufficiency claim and its determination was not unreasonable.  McGuire states, "the only evidence that Mr. McGuire was in any way involved in the home invasion is Carrie Lamb's recollection of a statement by Gi[p]son," and Lamb's testimony was not credible and was hearsay.  Doc. 1, p. 12.  McGuire's assertion that the only evidence linking him to the home invasion was Lamb's testimony is incorrect.  The state Court of Appeals identified other evidence in the record in addition to Lamb's testimony that demonstrated McGuire was involved in the home invasion: testimony describing a conversation McGuire had in a car on December 20 with Tim Donegan, wherein McGuire threatened to take the Donegans' television, Xbox, and anything else of value in the house if the debt was not paid and that, if the debt was not paid by a certain time, the debt would increase; McGuire sent Tarockis to the Donegans on December 20 to do his bidding, i.e., tell them that a debt needed to be paid; McGuire then joined Tarockis at the Donegans on December 20 and demanded money for Michael's drug debt, threatened to beat them up, said "they" would take the Donegans' television and Xbox if the debt was not paid, and pushed, punched and smacked Tim Donegan; and after the December 20 altercation, Juanita Donegan obtained a temporary protection order against McGuire.  There was evidence presented that Gipson owed McGuire money, Gipson and McGuire called each other four times on the evening of December 20, Gipson was at McGuire's house and left about 8:00 p.m., and that the following telephone activity thereafter occurred: Gipson texted Lamb, "I [sic] going to do something" at 8:03 p.m.; Gipson called McGuire at 8:23 p.m. and the call lasted for one minute, the Donegans

dialed 911 six minutes later, at 8:29 p.m., and McGuire called Gipson's phone at 8:49 p.m. and the Donegans' phone at 9:38 p.m. and 12:03 a.m. *McGuire*, 2015 WL 2354325, at **3-10.

McGuire argues that there was no evidence of the content of the phone calls between him and Gipson and that it is not illegal for one person to call another. Doc. 11, p. 4. He states, "To find that phone calls alone, without more, can be evidence of conspiracy and complicity subjects almost everyone to complicity liability." *Id.* But the evidence presented at trial was not just "phone calls alone, without more," as detailed above. His additional argument that Lamb was not credible also misses the mark. *See Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (federal habeas petitioner's insufficiency of the evidence claim arguing that the state's witnesses were not credible lacks merit: "attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence"); *Brown*, 567 F.3d at 205 (when considering a sufficiency of evidence claim in a habeas petition, a court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury."). Finally, his assertion that there is no evidence that he told Gipson to use force or a weapon (Doc. 11, p. 5) lacks merit. As the Ohio Court of Appeals observed, the use of violence was a foreseeable result of Gipson's attempted robbery and burglary of the Donegans, especially in light of the escalating violent history of McGuire's relationship with the Donegans.

Because the Ohio Court of Appeals determined that a rational trier of fact could have found McGuire guilty beyond a reasonable doubt and its determination was not unreasonable, McGuire's sufficiency of the evidence claim fails on the merits. *See Brown*, 567 F.3d at 205.

### B. Ground 2 is procedurally defaulted

In Ground 2, McGuire argues that the prosecutor made improper statements during closing arguments at trial. Doc. 1, p. 7. He asserts that the prosecutor made statements that he knew were false and incorrectly quoted the testimony of a witness, all of which misled the jury.

26

*Id.* In his Traverse, he lists fourteen statements, comprising four pages, allegedly made by the prosecutor during closing argument that he claims were improper. Doc. 11, pp. 11-14.

### 1. The prosecutor's alleged misstatements

Preliminarily, the only prosecutorial statement that is properly before this Court in federal habeas review is the prosecutor's alleged misstatement of Gipson's history of violence. The alleged improper prosecutorial statements contained in McGuire's Traverse were not presented to the Ohio courts as a stand-alone claim of prosecutorial misconduct; instead, McGuire presented the fourteen statements listed in his Traverse to the Ohio Court of Appeals in his Rule 26(B) Application as the underlying basis for his ineffective assistance of appellate counsel claim. *See, e.g.*, Doc. 9-1, p. 160. Alleging improper prosecutorial statements in a Rule 26(B) Application in an attempt to show ineffective assistance of appellate counsel for not raising an ineffective assistance of trial counsel claim based on trial counsel's failing to object to prosecutorial statements did not preserve McGuire's underlying prosecutorial misconduct claim as a stand-alone constitutional claim. *See* Ohio App. R. 26(B) (A Rule 26(B) Application for Reopening must be based on a claim of ineffective assistance of appellate counsel); *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008) ("[A] Rule 26(B) application based on ineffective assistance cannot function to preserve the underlying substantive claim" because "the two claims are analytically distinct[,]" quoting *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005) (internal quotation marks omitted)). Thus, when the Ohio Court of Appeals considered and rejected McGuire's ineffective assistance of counsel claim based on prosecutorial misconduct in his Rule 26(B) Application (Doc. 9-1, pp. 160-163), it considered the claim based on his assertion that appellate counsel was ineffective for not raising it. Doc. 9-1, pp. 233-234. *See also Roberts v. Carter*, 337 F.3d 609, 615 (6th Cir. 2003) ("In light of the requirements of Rule 26(B), the court's holding must be read as pertaining to the merits of [the petitioner's] ineffective assistance

of appellate counsel claim, not his [underlying] state procedural rule claim.").  Accordingly, the Court may only consider the arguments McGuire properly presented to the Ohio courts as a stand-alone claim of prosecutorial misconduct.

In his Petition, McGuire alleges that the prosecutor made statements he knew were false and incorrectly quoted the testimony of a witness.  Doc. 1, p. 7.  The alleged misstatements that McGuire properly presented to the Ohio courts as a stand-alone claim were that (1) the prosecutor implied that McGuire "was doing something wrong when he reviewed the discovery in his case and was present at his own trial" and (2) he stated that Gipson "has no criminal record, no history of violence whatsoever" when there was "no testimony about whether Gipson had a history of violence."  Doc. 9-1, pp. 61-62.  Nowhere in McGuire's Petition or Traverse does he complain that the prosecutor implied that McGuire did something wrong by preparing for trial by reviewing all the evidence.  The only claim that could generously be inferred from McGuire's Petition and Traverse that was also properly presented to the state courts, therefore, is that the prosecutor allegedly misstated Gipson's history of violence.  Accordingly, that is the only prosecutorial statement that is properly before this Court on federal habeas review.

### 2. Procedural default

However, McGuire's claim is procedurally defaulted.  At trial, McGuire's counsel did not object to the prosecutor's statements.  Ohio has a long standing and consistently enforced contemporaneous objection rule that prohibits a court from reviewing a claim on appeal that was not objected to at trial.  *See State v. Murphy*, 747 N.E.2d 765, 788 (Ohio 2001) ("The waiver rule requires that a party make a contemporaneous objection to alleged trial error in order to preserve that error for appellate review.  The rule is of long standing, and it goes to the heart of an adversary system of justice.").  Under the contemporaneous objection rule, the court "may take

notice of waived errors only if they can be characterized as 'plain errors.'"  *Id*.; Ohio R. Crim. P. 52(B).

On direct appeal in McGuire's case, the Ohio Court of Appeals noted that McGuire's counsel did not object to the prosecutor's remarks at trial and considered whether the trial court committed plain error.  *McGuire*, 2015 WL2354325, at *15.  When the Ohio Court of Appeals, citing McGuire's failure to object at trial, applied plain error review, it invoked a procedural bar—Ohio's contemporaneous-objection rule.  *Awkal v. Mitchell*, 613 F.3d 629, 648-649 (6th Cir. 2010) ("This court has held that [Ohio's] contemporaneous-objection rule is an adequate and independent state ground barring federal habeas review[,]" citing *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Lundren v. Mitchell*, 440 F.3d 754 (6th Cir. 2006)).  A district court may not entertain a habeas petition when the state court applies a procedural bar declining to address a petitioner's claims and the procedural bar "is independent of the federal question and adequate to support the judgment."  *Id*. at 648 (quoting *Coleman*, 501 U.S. at 729).  A state court's plain-error review of a procedurally defaulted claim for failure to object at trial is no exception to this rule.  *Id*. at 648-649.

Applying the *Maupin* factors to this case, the undersigned finds that Ohio's contemporaneous objection rule is a state procedural rule applicable to McGuire's claims, he failed to comply with that rule, and the Ohio Court of Appeals enforced the procedural rule when it applied plain error review.  785 F.2d at 138; *see also Durr v. McLaren*, 2015 WL 5101751, at *2 (6th Cir. Aug. 28, 2015) (first two prongs for procedural default are met when the petitioner failed to object at trial and the state court applied plain error review).  As noted, Ohio's contemporaneous objection rule is an adequate and independent state ground barring federal habeas review.  *Id*.; *Awkal*, 613 F.3d at 648-649.  That the Ohio Court of Appeals analyzed McGuire's claims under plain error review does not save this claim from procedural default.  *Id*.

(citing *Lundgren*, 440 F.3d at 765).[6]  And McGuire does not demonstrate cause or prejudice for his failure to follow the procedural rule.

Nor has he shown that he has suffered a fundamental miscarriage of justice, i.e., that his is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).  "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  McGuire offers no new, reliable evidence that he is factually innocent.

Accordingly, Ground 2 is procedurally defaulted.

### C.  Ground 1 is procedurally defaulted

In Ground 1, McGuire argues that the trial court erred when it allowed the hearsay testimony of Carrie Lamb.  Doc. 1, p. 5.  Ground 1 is procedurally defaulted because McGuire failed to raise it on direct appeal.  *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) ("Ohio courts have consistently held that claims that can be adjudicated based on facts in the record can only be presented on direct appeal," citing *State v. Lentz*, 639 N.E.2d 784, 785 (1994)); *Kelly v. Wilson*, 2009 WL 185947, at *10 (N.D. Ohio Jan. 26, 2009) (habeas ground claiming the trial court erred by allowing hearsay evidence was procedurally defaulted; claim is based on the record,  must have been raised on direct appeal, and is therefore barred from being raised

---

[6]  The *Lundgren* Court explained, "Plain error analysis is more properly viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits." 440 F.3d at 765 (citing *Scott v. Mitchell*, 209 F.3d 854, 866-867 (6th Cir. 2000)).

elsewhere by the doctrine of *res judicata*, citing *State v. Perry*, 226 N.E.2d 104 (Ohio 1967), *State v. Combs*, 652 N.E.2d 205 (Ohio 1994)).  Thus, McGuire has procedurally defaulted this claim. *See Williams*, 460 F.3d at 806 (a claim is procedurally defaulted when a petitioner failed to raise it in state court and pursue it through the state's ordinary appellate review procedures and state law no longer permits the petitioner to raise the claim); *O'Sullivan*, 526 U.S. at 848.

McGuire does not allege cause to excuse his procedural default.[7]  And he does not show that he was prejudiced.  Although he asserts that he was prejudiced because Lamb's testimony was a "major piece of evidence, which if accepted by the jury, totally negated and rendered worthless defendant's version of the robbery" (Doc. 11, p. 9), this assertion is not persuasive given all the other evidence presented at trial, discussed above by the undersigned with respect to the sufficiency of the evidence claim in Ground 5.  Finally, McGuire fails to allege, let alone demonstrate, actual innocence.  He only argues legal insufficiency, which is not actual innocence. *Bousley*, 523 U.S. at 623.

Therefore, Ground 1 is procedurally defaulted.

### D.  Grounds 3 and 4 are procedurally defaulted

In Ground 3, McGuire alleges that trial counsel was ineffective for abandoning a motion in limine regarding evidence that should have been excluded: evidence of the altercation that took place between McGuire and the Donegans on December 20, 2012.  Doc. 1, p. 8; Doc. 9-1,

---

[7]  Although McGuire does not allege ineffective assistance of appellate counsel for failing to raise Ground 1 on direct appeal as cause for his procedural default, his Rule 26(B) Application did raise an ineffective assistance of appellate counsel claim for failing to challenge the admission of Lamb's alleged hearsay testimony. *See* Doc. 9-1, p. 158.  The Ohio Court of Appeals considered this claim and found that appellate counsel was not ineffective. *Id*., pp. 233-234.  McGuire does not challenge this determination or argue that appellate counsel was ineffective.

p. 9.  In Ground 4, he alleges that the trial court allowed a biased juror to sit on the jury.[8]  Doc. 1, p. 10.

As a stand-alone claim, Ground 4 is procedurally defaulted because McGuire never raised this claim in any pleading before the state courts.  *See Williams*, 460 F.3d at 806.  Instead, McGuire alleged in his Rule 26(B) Application that trial counsel was ineffective for not excusing the allegedly biased juror for cause.  Construing Ground 4 as an ineffective assistance of trial counsel claim, it is still procedurally defaulted because both Grounds 3 and 4 should have been raised on direct appeal and were not.  Accordingly, both grounds are procedurally defaulted.  *See Van Hook v. Anderson*, 127 F.Supp.2d 899, 914, 918 (S.D.Ohio 2001) (a claim challenging the admission of prior acts is based on the trial court record, should have been raised on direct appeal, and is procedurally defaulted); *Cooper v. Warden, Lebanon Corr. Inst*., 2012 WL 5511320, at *14 (S. D. Ohio Nov. 14, 2012) (claim of juror bias appearing in the trial court record should have been raised on direct appeal and is procedurally defaulted on federal habeas review); *Gaston v. Haviland*, 2006 WL 255287, at *5 (N.D. Ohio Feb. 16, 2006) (claim of ineffective assistance of trial counsel is procedurally defaulted; claim was based on the record, defendant was represented by new counsel on direct appeal, and did not raise it on direct appeal).

As with respect to Grounds 1 and 2 discussed above, McGuire does not allege cause to excuse his procedural default.  Although he filed a Rule 26(B) Application alleging ineffective assistance of appellate counsel for failing to raise an ineffective assistance of trial counsel claim for trial counsel's failure to challenge the admission of prior acts and juror bias (Doc. 9-1, p. 158), the Ohio Court of Appeals found that appellate counsel was not ineffective and that McGuire was not prejudiced by the failure of trial counsel to raise these claims.  Doc. 9-1, pp.

---

[8]  In his Traverse, McGuire frames his juror bias claim as an ineffective assistance of counsel claim.  Doc. 11, p. 17 (explaining that trial counsel should have requested that the allegedly biased juror be excused for cause).

233-234.  McGuire does not challenge the state Court of Appeals' determination; nor does he argue why appellate counsel was allegedly ineffective for failing to raise these issues.

McGuire does not demonstrate that he would be prejudiced if the Court did not consider his claims.  He merely recites that the admission of the prior acts denied him his right to a fair trial and that the outcome would have been different if trial counsel did not fail to object.  Doc. 11, p. 19.  However, the prior acts (regarding McGuire's visit to the Donegans on December 20, 2012) were relevant to McGuire's motive or intent to rob the Donegans on December 27 and were admissible.  *See State v. Curry*, 330 N.E.2d 720, 725 (Ohio 1975) (R.C. § 2945.59 permits the admission into evidence of other acts that "form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment.").  As for his claim of juror bias, McGuire asserts that juror Stokes stated that he might hold against McGuire the fact that Stokes was good friends with Detective Clark's father and had known Detective Clark his whole life.  Doc. 11, p. 17.  However, Stokes actually stated (apparently jokingly) that this relationship might cause him to go against the state, not McGuire.  Doc. 9-3, p. 174. McGuire fails to explain why the fact that Stokes also stated that he had known McGuire's trial counsel for 20 years and that Stokes' daughter also knew counsel and his ex-wife prejudiced him.  Doc. 9-3, pp. 178-179.  Stokes stated that, regardless of these relationships, he could hold the state to its burden of proof.  Doc. 9-3, p. 180.  Thus, McGuire's claim lacks merit.  *See Gipson v. Sheldon*, 2015 WL 1980244, at *21 (N.D.Ohio May 1, 2015) (claim of ineffective counsel based on failure to raise issue of biased jurors unfounded: the first juror knew prosecutor and stated that the prosecutor "had credibility with him" but also stated that he could decide the case based on the evidence presented; second juror had a distant cousin in the prosecutor's office; third juror knew a detective and two sergeants in the case casually but could put aside those relationships and hold the state to its burden of proof; and fourth juror, who was a neighbor

of the investigating detective, stated that he thought she was "a good detective and speaks the truth," and asked her about the case the day after it happened, but he did not discuss the case with her thereafter and juror stated he could presume the petitioner was innocent and find him not guilty if the evidence was insufficient).

In short, McGuire does not argue that his trial counsel's failure to object to the admission of this evidence or to strike juror Stokes for cause rendered trial counsel's representation deficient under the standards articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). And, as above, he does not offer new, reliable evidence that he is factually innocent. Therefore, Grounds 3 and 4 are procedurally defaulted.

## IV. Conclusion and Recommendation

For the reasons stated above, the undersigned recommends that McGuire's habeas Petition be **DISMISSED** in part and **DENIED** in part because a portion of Ground 5 is not cognizable and the remainder of Ground 5 fails on the merits, and Grounds 1, 2, 3 and 4 are procedurally defaulted.


Dated: January 9, 2017

Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).